IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

DAVID WILLIAMS,                    )
                                   )
            Plaintiff,             )
                                   )
    v.                             )    Case No.
                                   )    05-3560-CV-S-REL-SSA
JO ANNE BARNHART, Commissioner     )
of Social Security,                )
                                   )
            Defendant.             )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff David Williams seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Titles
II and XVI of the Social Security Act ("the Act").
Plaintiff argues that (1) the ALJ erred in evaluating
plaintiff's credibility, (2) the ALJ erred in evaluating the
opinion of Phillip Budzenski, M.D., and (3) the ALJ erred in
finding that plaintiff's impairment did not meet listing
1.04A.  I find that the substantial evidence in the record
as a whole supports the ALJ's finding that plaintiff is not
disabled.  Therefore, plaintiff's motion for summary
judgment will be denied and the decision of the Commissioner
will be affirmed.

## I.   BACKGROUND

On May 22, 2003, plaintiff applied for disability benefits alleging that he had been disabled since February 14, 2003.  Plaintiff's disability stems from a neck injury, nerve damage, depression, high blood pressure, sleep apnea, and respiratory problems.  Plaintiff's application was denied on September 11, 2003.  On October 7, 2004, a hearing was held before an Administrative Law Judge.  On January 26, 2005, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On September 22, 2005, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The

Case 6:05-cv-03560-REL   Document 11   Filed 10/05/06   Page 2 of 59

determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

Case 6:05-cv-03560-REL   Document 11   Filed 10/05/06   Page 3 of 59

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

4

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

**IV.   THE RECORD**

The record consists of the testimony of plaintiff and vocational expert Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

**A.   SUMMARY OF TESTIMONY**

During the October 7, 2004, hearing, plaintiff testified; and Cathy Hodgson, a vocational expert, testified

at the request of the ALJ.

**1. Plaintiff's testimony.**

At the time of the administrative hearing, plaintiff was 39 years of age and is currently 41 (Tr. at 275). He is 5'7" tall and weighs 170 pounds (Tr. at 275). Plaintiff is married and has two children, ages 15 and 12 (Tr. at 275). Plaintiff's wife is a bail bond agent (Tr. at 277). Plaintiff receives Medicaid and $400 per month in food stamps (Tr. at 277).

Plaintiff has a high school education and also went to Vatterott College for one year (Tr. at 276). He earned the equivalency of an associate's degree in computer-aided drafting (Tr. at 276).

Plaintiff cannot work because his back burns between his shoulders, his arms are numb, he gets burning sensations going into his fingers, and he has headaches (Tr. at 277-278). Plaintiff's lower back hurts a lot, but he has not been able to get a doctor to look at that (Tr. at 279). Plaintiff also has burning in his left leg all the time (Tr. at 279). If he stands on a hard surface for 30 minutes he is "pretty well done" (Tr. at 279).

Plaintiff worked construction after his last surgery but he had to leave because of the vibration of the machines

6

(Tr. at 280). He then worked for a drafting company but
could not hold his arms up to use the keyboard (Tr. at 280).
He was then put in the shop doing welding fabricating, but
being on the hard surface caused him to need to lie down
every so often and he also had to take more medication than
what he was supposed to take (Tr. at 280).

Plaintiff has tried several jobs since his alleged
onset date (Tr. at 278). He tried to mow grass part time
and he tried to do some construction work (Tr. at 278-279).
He performed the construction job for a little over a week
and could not do it (Tr. at 279).

Plaintiff spends most of his days lying down or
reclining (Tr. at 281, 283-284). Plaintiff can put his
clothes in the hamper (Tr. at 281). Plaintiff has tried to
do some housework, but then he winds up taking more
medication than he is supposed to (Tr. at 281-282).
Plaintiff takes Wellbutrin for depression because he was
having side effects from Zoloft (Tr. at 282). Plaintiff has
never been treated by a psychologist or a psychiatrist, his
regular doctor has prescribed the depression drugs (Tr. at
288). Plaintiff watches television (Tr. at 284). Plaintiff
drives only when he has to, which is about twice a week (Tr.
at 276). He is able to go to the grocery store (Tr. at

7

284).

Plaintiff tries to avoid stairs because it strains his back (Tr. at 288). He can not walk an entire block before suffering pain (Tr. at 288). He can stand for only 30 minutes at a time (Tr. at 289). He can only sit for 15 minutes before his back starts hurting (Tr. at 289). He estimated he could lift and carry a maximum of eight to ten pounds with both hands (Tr. at 289-290). If he were to unload the dishwasher, he would have to use both hands (Tr. at 290). He could not put them in the cabinet using just his right arm (Tr. at 290). If he uses his right hand very much, it starts shaking (Tr. at 290). Plaintiff also cannot do anything overhead with his right arm (Tr. at 290).

Plaintiff can sometimes do things overhead with his left arm if it does not involve something very heavy (Tr. at 291). Plaintiff is right-handed and cannot write a whole page without stopping (Tr. at 291). Plaintiff cannot do much with his left arm because it is not coordinated (Tr. at 291). He could probably use his left arm for an hour and a half per day (Tr. at 295). He could only use his right arm for a total of 30 minutes (Tr. at 296). He has to really concentrate and put a lot of effort into doing things with either arm (Tr. at 291). Plaintiff could use his arms

8

sitting at a desk for a maximum of ten minutes (Tr. at 291-292).

Plaintiff was examined by a doctor selected by the Social Security Administration (Tr. at 292). That doctor put some change on the table and told plaintiff to try to pick it up (Tr. at 292). He did not have plaintiff squeeze on anything or use any needles (Tr. at 292).

Plaintiff's doctor tried to get him into St. John's in Springfield, but they will not admit him until he pays $30,000 he owes the hospital (Tr. at 293). He was not able to get into the University of Missouri Columbia hospital for several months, so he went to Truman Medical Center in Kansas City (Tr. at 293).

Recently plaintiff spent 16 weeks in the Laclede County jail for a concealed weapon charge relating to a hostage situation (Tr. at 284-285, 294). Plaintiff said it was not a hostage situation, it involved his girl friend who is now his wife, and plaintiff was "full of pain pills" that he was taking so he could work (Tr. at 295). Plaintiff had to pay $600 in fines and jail costs, plus he is on probation for five years (Tr. at 285). Years ago plaintiff had some trouble with alcohol and he was taking Vicodin more than he was supposed to because he was trying to work and support

his family (Tr. at 286). He has not had anything to drink in two and a half years (Tr. at 286-287). The last time he took Vicodin was in February (Tr. at 287). Plaintiff had an accident in November of 2001 or 2002 where he was thrown from his horse and landed on his head (Tr. at 287).

**2. Vocational expert testimony.**

Vocational expert Cathy Hodgson testified at the request of the Administrative Law Judge. Plaintiff's past relevant work consists of being a truck driver, which is semiskilled and medium exertional level, D.O.T. 903.683-010 (Tr. at 298). He also worked as a stave machine operator, semiskilled and medium, D.O.T. 667.685-062 (Tr. at 298). And he has worked as a construction worker I, which is semiskilled and heavy, D.O.T. 869.664-014 (Tr. at 298).

The first hypothetical involved a person who had the limitations described by plaintiff in his hearing testimony (Tr. at 298). The vocational expert testified that such a person could not perform any work (Tr. at 298).

The second hypothetical incorporated the findings of Phillip Budzenski, M.D., on August 26, 2003, found at pages 186 through 191 of the administrative record (Tr. at 299-300). The vocational expert testified that such a person could not perform any of plaintiff's past relevant work but

10

could perform a wide range of light unskilled work such as small products assembler (D.O.T. 739.687-030) with 655,000 jobs in the country and 19,000 in the region (Tr. at 300). The person could also be a cashier II (D.O.T., 211.462-010) which is light unskilled work with 296,000 positions in the nation and more than 6,000 in the region (Tr. at 300).

The next hypothetical incorporated the findings of Mark Coburn, M.D., of Breech Regional Medical Center after an MRI of the cervical spine, found at page 245 of the administrative record, with no over-the-shoulder work, use of the right arm and hand for less than one hour per day and less than ten pounds, use of the left arm and hand for less than two hours per day, and numbness resulting in a loss of both fine and gross movements (Tr. at 301-302). The vocational expert testified that such a person could not perform any work (Tr. at 302).

**B.    *ADMINISTRATIVE REPORTS***

The record establishes that plaintiff earned the following income from 1982 through 2004:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1982 | $ 1,619.66 | 1994 | $22,753.84 |
| 1983 | 1,887.87 | 1995 | 21,726.95 |
| 1984 | 8,221.78 | 1996 | 22,520.14 |

11

| 1985 | 11,027.92 | 1997 | 701.28 |
|------|-----------|------|--------|
| 1986 | 7,923.58 | 1998 | 3,142.72 |
| 1987 | 6,413.18 | 1999 | 25,752.11 |
| 1988 | 2,136.88 | 2000 | 25,782.69 |
| 1989 | 1,383.44 | 2001 | 22,237.03 |
| 1990 | 5,849.60 | 2002 | 25,235.70 |
| 1991 | 11,816.14 | 2003 | 2,859.57 |
| 1992 | 19,937.87 | 2004 | 0.00 |
| 1993 | 27,800.92 | | |

(Tr. at 50, 53, 56).

## C.   SUMMARY OF MEDICAL RECORDS

Almost all of plaintiff's medical records predate his alleged onset date and occurred while plaintiff was working full time.

On March 15, 1994, plaintiff saw Neil Schwartzman, M.D. (Tr. at 106). Plaintiff complained of stiffness in the neck and down to the right elbow. He said he woke up four days earlier with a stiff neck, and that it had been occurring about every three months for the past two years. Plaintiff had full range of motion in his neck and "no objective finding of decreased sensation". Dr. Schwartzman diagnosed cervical muscle strain and prescribed Ansaid, a non-steroidal anti-inflammatory.

12

On May 22, 1996, plaintiff saw Dr. Schwartzman for coughing (Tr. at 110). "Unfortunately, he does smoke, although he has cut back from three packs a day to one to one and a half packs a day." Plaintiff was diagnosed with upper respiratory infection with asthmatic or bronchospastic symptoms. "[T]he importance of discontinuing his smoking was stressed."

On September 19, 1996, plaintiff saw Yvonne Lopez, MSN, complaining of cold symptoms (Tr. at 109). The records state that plaintiff was smoking two to three packs of cigarettes per day and had been smoking since he was 14 years old. He was diagnosed with bronchitis. "I highly recommended smoking cessation and counseled him that continued smoking will result in increased frequency of pulmonary infection, emphysema, and cancer. He was offered smoking cessation counseling through our clinic."

On November 8, 1999, plaintiff was seen at St. John's Physicians and Clinics by Dan Johnson, RN, for "chest fullness" (Tr. at 112-113). "Unfortunately he continues to smoke 3 packs of cigarettes a day. He has a very strong family history of cardiac disease." An EKG was performed which Dr. Schwartzman read and agreed that the results were normal. Plaintiff was diagnosed with pre-cordial pain

related to anxiety and stress at work. Plaintiff was given a prescription for Xanax. "Education was done in the office concerning his smoking habit. The patient is amenable to cessation. He states that he will not smoke after he is finished with his current pack, that indeed he has got some chewing tobacco that he will use for approximately the next week in a weaning down process. . . . Past history of alcoholism. The patient states that he is currently off of the alcohol and states that he does not want to pick it up anymore. Past history does include a 12-pack a day at its worst."

On December 2, 2000, plaintiff was seen at St. John's Regional Health Center where someone read a CAT scan of his cervical spine which had been taken at Breech Regional Medical Center by G. David Runyon, D.O. (Tr. at 114-115, 169-170). Plaintiff said he fell from his horse a week ago and now has pain and numbness in his right shoulder, arm, and hand. "No fractures are identified. There are no findings to suggest the presence of subluxation[1]. The C1-2, C2-3, C3-4, and C4-5 disc space levels are unremarkable. At

------

[1]Subluxation is when one or more of the bones of the spine (vertebrae) move out of position and create pressure on, or irritate spinal nerves.

14

C5-6, small osteophytes [bone spurs] extend posteriorly into the lateral recesses bilaterally, right slightly greater than left. The neural canals[2] appear widely patent [open]. At C6-7, a moderate-sized osteophyte [bone spur] extends into the right lateral recess. The neural foramina appear widely patent [open]. The C7-T1 level is unremarkable. No disc herniations[3] are appreciated at any level." Impression was listed as follows:

    1.    No acute traumatic abnormality is appreciated.

    2.    Osteophytes extend into the lateral recesses at
          C5-6 on the right and left.

    3.    A small to moderate osteophyte extends into the
          right lateral recess at C6-7.

On December 4, 2000, plaintiff saw J. Bond, M.D., at the emergency room of Breech Regional Medical Center (Tr. at 168, 172). Plaintiff got thrown off a horse about a month ago and was doing intermittently fine but occasionally started having some pain into his right arm. "He threw a ball today and pain dropped him to his knees." Dr. Bond had

---

[2]Referring to the dorsal [back] side of the vertebral bodies where the spinal cord is located.

[3]A spinal disc herniation is a pathological condition in which a tear in the outer, fibrous ring (annulus fibrosus) of an intervertebral disc allows the soft, central portion (nucleus pulposus) to be extruded (herniated) to the outside of the disc.

15

a CT of plaintiff's neck done which was normal. Plaintiff had Demerol and Phenergan injections in the ER. Dr. Bond called Dr. John Tabb and arranged for plaintiff to follow up with him. "Dr. Mansell had previously written prescriptions for Medrol Dosepak [steroid to reduce swelling], Vicodin [hydrocodone, a narcotic analgesic, and acetaminophen, or Tylenol], Motrin [Ibuprofen], and Valium [reduces anxiety and muscle spasms]. The patient leaves the ER overall in good condition, but with a probable cervical disk." Plaintiff was told not to return to work until he was released by Dr. Tabb.

On January 23, 2001, plaintiff had a neurosurgical consultation with John Ferguson, M.D. (Tr. at 161-162) "REVIEW OF SYMPTOMS: The patient reportedly has a left bundle branch block, emphysema and despite this is a smoker. The remainder of the review of systems is totally negative. . . ." Dr. Ferguson performed a physical exam. He found that plaintiff had normal mental status, full range of motion in the upper and lower extremities. Plaintiff had 3/5 strength of the right triceps and 4/5 strength of the right biceps and wrist dorsiflexors. All other major motor groups were within normal limits. Dr. Ferguson assessed possible ruptured cervical disc. He instructed plaintiff to

16

return on February 6, 2001, for a follow up and to bring his x-rays with him. In the meantime he was to continue with cervical traction at home as an outpatient.

On February 6, 2001, plaintiff saw John Ferguson, M.D., for a follow up (Tr. at 160). On neurological exam, Dr. Ferguson found weakness in the right deltoids, external rotators, biceps, and to a lesser extent triceps. "This will essentially make all levels involved symptomatic and in view of the multiplicity of levels, the only immediate option will be to proceed with posterior cervical foraminotomies and discectomies at the C4-5, C5-6, and C6-7 levels on the right side. The patient understands that he may well have to have an anterior procedure following the triple level foraminotomies, however, if he has an anterior procedure he will almost certainly have to have a posterior procedure following that, whereas with a posterior approach he may avoid anterior surgery. Arrangements are made for him to undergo posterior cervical laminectomy on February 19, 2001, at St. John's Hospital."

On March 12, 2001, plaintiff saw Aye KoKo, M.D., with a chief complaint of depression (Tr. at 118-119). Plaintiff said he was depressed, tired and fatigued for no reason, had been crying for no apparent reason, was irritable and angry,

17

had loss of interest and difficulty focusing, had loss of appetite and weight loss, and was not sleeping well. Plaintiff also complained of burning and tingling in his right hand and shoulder blade, but denied weakness. Under social history, the record states, "Getting fired from job and going through break-up with girl friend." Plaintiff was smoking two to three packs of cigarettes per day, and his medications consisted only of ibuprofen. Plaintiff weighed 175 pounds. Dr. KoKo assessed cervical radiculopathy, unchanged; depression, unchanged; and tobacco abuse, unchanged. Dr. KoKo ordered chest x-rays and a pulmonary function test, and plaintiff was prescribed the following medications: Wellbutrin [antidepressant], Lortab [hydrocodone, a narcotic analgesic, mixed with acetaminophen, or Tylenol], Ibuprofen, Ultram [pain reliever], and Flexeril [muscle relaxer].

On April 27, 2001, plaintiff saw John Ferguson, M.D., for a follow up (Tr. at 159). "Overall he is significantly improved, but he still does have residual posterior cervical discomfort, which is primarily muscular spasm, but has residual numbness in his hands and arms. He also notes that if he hyperextends his neck he gets numb quickly in the right upper extremity. Currently in view of improvement

18

following surgery he will progress to, an additional four weeks to see how much additional improvement will develop. He still may well require anterior cervical discectomy with allograft fusion and plating."

On June 26, 2001, plaintiff saw John Ferguson, M.D., for a follow up (Tr. at 157). "He underwent a previous posterior cervical laminectomy with foraminotomy at C4-5, C5-76 and C67-7 all on the right side. Postoperatively he is improved, but he still has residual discomfort, which is not unanticipated. He has a persistently large defect at C4-5, which is left central and could not be removed surgically from a posterior approach. Given this scenario a repeat study in the form of myelogram and CT scan will be arranged for July 13, 2001, and he probably will need anterior cervical discectomy with allograft fusion at that level."

On June 27, 2001, plaintiff saw Aye KoKo, M.D., for neck pain (Tr. at 116-117). Plaintiff complained of pain in his neck, pain in his right arm and hand, and numbness and tingling in the right upper extremity. Plaintiff's forward flexion and extension was decreased by pain, lateral flexion and rotation to the right were decreased by pain, to the left was okay. Plaintiff had a weak right arm. His legs

19

were normal.  Dr. KoKo prescribed Diazepam[4], Soma [muscle relaxer], and Mobic [non-steroidal anti-inflammatory].

On July 13, 2001, plaintiff saw John Ferguson, M.D., for a follow up (Tr. at 156).  Plaintiff had a myelogram/CT scan which showed a large extradural defect at C5-6, especially on the right and smaller defect at C6-7.  Left sided defects were minimal.  The lateral view demonstrated similar abnormalities with the most significant problem being at C5-6.  "Should the patient desire to proceed, he would need an anterior cervical discectomy with allograft fusion and plating at the C4-5 and C5-6 level.  The patient is going to give further consideration to the situation and will call back with a decision."

On March 21, 2002, plaintiff saw Philip Mitchell, M.D., to establish care (Tr. at 147-148).  Plaintiff said he got married four months earlier and his wife noticed that plaintiff snores loudly and stops breathing several times a night.  Plaintiff said he had upper back and neck pain. Plaintiff was smoking three to four packs of cigarettes per day, had a history of alcohol abuse, and was drinking a 12-pack monthly.  Dr. Mitchell advised that plaintiff stop

---

[4]Diazepam is used to treat anxiety and muscle spasms.

20

drinking.  Plaintiff denied depression, anxiety, memory loss, mental disturbance, cold intolerance, and heat intolerance.  Dr. Mitchell performed a physical exam. Plaintiff's gait was normal, "can undergo exercise testing and/or participate in exercise program."  Sensation was intact to touch and pin prick.  Dr. Mitchell observed no depression, anxiety, or agitation.  Dr. Mitchell ordered a sleep study.

On April 18, 2002, plaintiff saw Philip Mitchell, M.D., complaining of back pain (Tr. at 145).  Plaintiff had pain in the thoracic area with numbness radiating to both hands. "He is now wanting to see neurosurgeon again as he is to the point he does not feel that he can continue with the discomfort."  During a physical exam, Dr. Mitchell found that plaintiff had normal range of motion and strength in his upper extremities, but had decreased sensation to skin touch and pin prick on the right wrist.  He assessed cervical radiculopathy deteriorated, and prescribed Vioxx [non-steroidal anti-inflammatory] and a neurosurgery consult.

On May 14, 2002, plaintiff saw John Ferguson, M.D., for a follow up (Tr. at 155).  "He was last seen in July 2001 at which time it was felt that he could proceed with an

21

anterior cervical discectomy with allograft fusion and plating and the C4-5 and C5-6 levels assuming that he felt the problem was severe enough to warrant said treatment. The patient managed the situation conservatively in the interim but returns today with complaints of low back pain extending into the right leg and particularly posteriorly to the knee and involving the medial aspect of the thigh." Dr. Ferguson ordered an MRI of the cervical spine.

On May 16, 2002, plaintiff had an MRI of the cervical spine (Tr. at 121). Douglas Goodman, M.D., assessed:

1. Degenerative changes of the cervical spine at C5-6 and C6-7 with associated right uncovertebral spurring encroaching on the right side of the thecal sac[5] and resulting in right foraminal[6] stenosis [narrowing] which appears clinically significant.

2. Small osteophyte [bone spur] arising from the right side of the C4-5 disc space deforming the right side of the cord, the right neural foramen is patent [open, or

------

[5]A thin walled tube filled with cerebrospinal fluid ("CSF") that surrounds the spinal cord. CSF is the cushiony fluid that protects the brain and spine and helps distribute nutrients to these structures.

[6]A foramen is a natural opening or perforation through a bone or a membranous structure.

22

normal].

On May 22, 2002, plaintiff underwent a sleep study at St. John's Regional Health Center due to snoring and "witnessed apnea[7]" (Tr. at 122, 137). Dr. John Brabson assessed mild to moderate obstructive sleep apnea syndrome and recommended positional training for the snoring and a repeat titration study with nasal CPAP[8].

On June 2, 2002, plaintiff saw John Brabson, M.D., at the Sleep Disorder Center for a CPAP titration study (Tr. at 136). "The patient did sleep with the TV on at his request because he 'needed the noise.' Arousals associated with noise from the TV were seen to fragment sleep. Mild to moderate obstructive sleep apnea syndrome with improvement using [CPAP]. . . . Good sleep hygiene could benefit the patient."

---

[7]Apnea is absence of breathing.

[8]Continuous Positive Airway Pressure. Nasal CPAP delivers air into the airway through a specially designed nasal mask or pillows. The mask does not breathe for the person; the flow of air creates enough pressure when the person inhales to keep the airway open. CPAP is a nonsurgical treatment for the alleviation of snoring and obstructive sleep apnea. During a CPAP titration study, the person is places on a CPAP machine and goes to sleep. The CPAP device is adjusted gradually throughout the night until snoring and apnea are effectively treated.

23

On June 12, 2002, plaintiff saw Philip Mitchell, M.D., complaining that he had been put back on days and had been unable to get up the last two mornings (Tr. at 143). Plaintiff wanted a prescription for the CPAP as the specialist was out of the office until next week. Dr. Mitchell told plaintiff he would have to wait for Dr. Brabson to prescribe the machine.

On June 16, 2002, John Ferguson, M.D., evaluated the May 16, 2002, MRI of plaintiff's neck (Tr. at 154). "There is a small extradural defect at C4-5 on the right. There is a large extradural defect at C5-6 on the right. There is a small extradural defect at C6-7 on the right. Clinical correlation will be necessary but certainly the C5-6 defect is clinically significant."

On July 5, 2002, plaintiff saw John Ferguson for a follow up (Tr. at 153). Dr. Ferguson scheduled a preoperative evaluation and wrote, "Because he is a smoker, he will also need an EKG and chest x-ray."

On July 10, 2002, plaintiff had an MRI of his cervical spine (Tr. at 131-132). Douglas Hacker, M.D., concluded that there was degenerative disc narrowing at C5-6 and C6-7.

On July 18, 2002, plaintiff saw Philip Mitchell, M.D., for a preoperative evaluation (Tr. at 140-141). Plaintiff's

24

habits were listed as: "Tobacco:  cigarettes 1 to 1 1/2
packs per day, discussed quitting; Alcohol:  history of
abuse, drinks 6 pack monthly now, cessation advised."
Plaintiff denied depression, anxiety, memory loss, mental
disturbance, fatigue.  Dr. Mitchell noted no depression,
anxiety, or agitation.  Plaintiff's EKG, CBC[9], CMP[10], and
chest x-rays were all normal.  Plaintiff was approved for
neck surgery.

On July 22, 2002, plaintiff underwent an anterior
cervical diskectomy with allograft fusion[11] at the C6-7 and
C5-6 position, performed by John Ferguson, M.D. (Tr. at 125-
129).  The records reflect that plaintiff had undergone a
posterior cervical laminectomy[12] at C4-5, C5-6, and C6-7 on

---

[9]Complete Blood Count, a calculation of the cellular
makeup of blood.

[10]Comprehensive Metabolic Panel, a series of generally
14 different blood tests used as a broad screening tool to
evaluate organ function.

[11]Anterior cervical diskectomy is an operation
performed on the upper spine to relieve pressure on one or
more nerve roots, or on the spinal cord. The procedure is
explained by the words anterior (front), cervical (neck),
and diskectomy (cutting out the disc).  The vertebrae are
then fused together.

[12]The normal cervical spine is composed of seven
building blocks called vertebrae (labeled C1 through C7)
that sit on the thoracic spine. At the upper end of the
cervical spine sits the head. The cervical spine allows the

the right side in February 2001 with significant

improvement, but continued to have cervical and upper

extremity discomfort. Plaintiff's condition on discharge the

following day was improved, and his discharge prognosis was

satisfactory.  His discharge medications were Lorcet

[hydrocodone, a narcotic analgesic, mixed with

---

head to bend forward (flex) and backward (extend) and tilt
and twist the head to the left and right. Each vertebrae is
constructed of a body, lamina, and pedicles which surround
an opening, the spinal canal. On each side of a cervical
vertebra lie the facets, the portion of the vertebra that
forms the joints between two vertebrae. The bone lying
between the upper and lower facets of a vertebra is called
the lateral mass. Through the spinal canal passes the spinal
cord. The spinal cord is made up of many nerve tracts that
run the length of the cord and carry electrical impulses
from the brain to the nerve roots at every level and from
the nerve roots to the brain. The major tracts that control
movement are in the front (anterior) part of the cord. The
major tracts that carry sensation to the brain are in the
back (posterior) part of the cord. Nerve roots are present
at each level and exit the spine through holes (foramina)
formed by two adjacent vertebrae. The nerve roots eventually
form into nerves that go to the arms. The spinal cord and
roots float in fluid (cerebrospinal fluid) and are contained
within a fibrous sac called the dura. Separating any two
vertebral bodies is a soft elastic material called a disk.
The disk is composed of two parts, a soft center called the
nucleus and a tough outer band called the annulus. Lining
the surface of the disk space of the two vertebrae on top
and bottom are thin plates of cartilage. There are seven
cervical disks beginning below C2 and extending below C7.
There is no disk between C1 and C2. Cervical stenosis
(narrowing) can place pressure on the spinal cord. If most
of the compression is in the back, this condition can be
treated with a posterior cervical laminectomy. The objective
of this procedure is to remove the lamina (and spinous
process) to give the spinal cord more room.

26

acetaminophen, or Tylenol] and Soma [muscle relaxer].

On August 7, 2002, plaintiff was seen by Philip Mitchell, M.D., for dizziness (Tr. at 138-139). "[W]hat he really describes is vertigo[13], especially when lying down, and when moving head, these symptoms began after neck surgery and seem worse now". Plaintiff denied any headaches. During a physical examination, Dr. Mitchell noted no depression, anxiety or agitation. He assessed cervical radiculopathy, improved; and vertigo. He prescribed Meclizine[14].

On August 16, 2002, plaintiff saw John Ferguson, M.D., for a follow up (Tr. at 152). "Postoperatively he is doing well with resolution of neck and arm pain. He does have some slight residual shoulder discomfort on the right and some slight tingling in his fingertips still. Overall his progress is satisfactory and neurologically he is normal."

On October 15, 2002, John Ferguson, M.D., reviewed the cervical spine series from Breech Medical Center dated October 16, 2002 (Tr. at 151). "The films demonstrate

---

[13]A sensation of spinning or whirling.

[14]Used to treat nausea, vomiting, and dizziness associated with motion sickness. Meclizine may also be helpful in treating vertigo.

anterior cervical fusion with allograft bone and cervical plating at C5, C6 and C7 with excellent graft position and developing fusion being noted."

On October 16, 2002, plaintiff had x-rays taken of the cervical spine (Tr. at 164). There was foraminal encroachment by spurs at C5-6 bilaterally and C6-7 on the right.

On November 7, 2002, plaintiff saw Phillip Mitchell, M.D., at St. John's Lebanon Family Practice for neck pain which had started six to eight months ago (Tr. at 184-185). Plaintiff's depression was unchanged, "asthma not as good, continues to smoke". Plaintiff reported that his neck pain was exacerbated by sitting, movement, and coughing or deep breaths, and that his pain was relieved by nothing. Plaintiff reported that he needed a refill of Serevent[15], and the Zoloft was not helping. Plaintiff was listed as a smoker and sad he drinks a six-pack monthly. Plaintiff had decreased range of motion in his neck, but no measurements were provided. He had wheezing and rales, but otherwise normal breath sounds. He had a flat affect. Dr. Mitchell assessed cervical radiculopathy, asthma, and depression. He

_____

[15]A bronchodilater used to improve breathing.

Case 6:05-cv-03560-REL   Document 11   Filed 10/05/06   Page 28 of 59

prescribed Advair, told plaintiff to continue the Zoloft, and gave him a trial of Ambien (induces sleep and causes relaxation). Plaintiff was counseled on lifting techniques, smoking cessation, and compliance with medications.

On November 26, 2002, plaintiff saw Phillip Mitchell, M.D., at St. John's Lebanon Family Practice for upper back pain (Tr. at 182-183). He reported that his pain was worsened by movement and was relieved by remaining still. Plaintiff said that the Zoloft was working and his breathing had improved with Advair. Dr. Mitchell found that plaintiff had decreased range of motion in his neck, but he did not record any range of motion measurements. Plaintiff had muscle spasm and vertebral tenderness at T2-4. His mood and affect were normal. Plaintiff had wheezing and decreased breath sounds. Dr. Mitchell assessed asthma and chronic back pain. He refilled plaintiff's Soma and prescribed an illegible medication with no refills.

On December 26, 2002, plaintiff saw Phillip Mitchell, M.D., at St. John's Lebanon Family Practice for coughing (Tr. at 180-181). Plaintiff was listed as a smoker, one pack per day. He reported no change in his neck or arm pain. Plaintiff was prescribed Vicodin and Amoxil (antibiotic).

29

On January 23, 2003, plaintiff saw Phillip Mitchell, M.D., at St. John's Lebanon Family Practice for back pain which he stated began months ago (Tr. at 178-179). Plaintiff reported that his pain was exacerbated by "nothing" and by "movement". He said the pain was relieved by "nothing". Plaintiff reported that he was scheduled to see a neurosurgeon the following month. Plaintiff's neck flexion was 65°, extension was 10°, right lateral flexion was 20° and left lateral flexion was 20°. (Normal cervical flexion is 60°, normal extension is 75°, and normal lateral flexion is 45°). Dr. Mitchell assessed cervical radiculopathy. He refilled plaintiff's Vicodin with no refills. Dr. Mitchell counseled plaintiff on lifting techniques, lifting precautions, and smoking cessation.

February 14, 2003, is plaintiff's alleged onset date.

On August 26, 2003, plaintiff was examined by Phillip Budzenski, M.D., at the request of Disability Determinations (Tr. at 186-193). Dr. Budzenski's report reads in part as follows:

> HISTORY OF PRESENT ILLNESS: Claimant notes having a non-work related injury where he ruptured disks between 3 levels of vertebrae. He apparently had partial disk removal in 2000. He had another surgery in July 2002 with fusion of the C5 C6 and C7 levels. He notes that a titanium plate was inserted. A CT scan was performed afterwards but he has had no other testing since that

30

time. He had [a] physical prior to the surgery but not
after. He has some decreased range of motion of his
neck, but feels that he has recovered a good portion of
his decreased range of motion. He had difficulty
raising his arms above his head. . . .

Claimant has had a history of depression back to 1998.
He currently takes Zoloft for this. He has had
improvement with taking Zoloft.

Claimant notes having hypertension diagnosed in 2003.
He notes he has cut back his sodium and caffeine
intake. He cut his caffeine intake to moderate and his
sodium does continue to be high but previously had been
very high. He has not been working on any weight loss
program. He feels that his blood pressure is under
reasonable control because his doctor has not given him
another medication. He notes that he does not have a
doctor.

PAST MEDICAL HISTORY:
- Sleep disorder - he had a sleep study done that
  did not show any evidence of sleep apnea
- History of asthma or emphysema - he was told to
  cut out his smoking. . . .

SOCIAL HISTORY: The claimant has completed 12 years of
formal education, with 1 yr of technical school
training. He last worked full-time February 14, 2003
when he went to jail. Claimant has a 20-year history
of smoking more than 5 packs of cigarettes per day. He
is currently smoking 1 pack per day. He quit drinking
in February 2002. He notes having high use prior to
that time on a daily basis. . . .

PERSONAL PHYSICIAN: The claimant does not have a
primary care physician.

REVIEW OF SYMPTOMS: . . . Claimant states being able
to perform basic activities of daily living.

PHYSICAL EXAMINATION: Blood pressure is 139/82. . . .
[C]laimant's height is 5 ft. 8 in., weight is 208 lb.
BMI [body mass index] is 31.6. . . .

31

GENERAL:  The claimant is right-hand dominant.  He is
pleasant and cooperative, well dressed and overweight.
He ambulates with a normal gait which is not unsteady,
lurching, or unpredictable.  Claimant is stable at
station and appears comfortable in the seated and
supine positions.  Speech is fluent, follows directions
and commands without difficulty, is able to hear and
understand normal conversational tones.  Memory for
recent and remote medical events is preserved.
Intellectual function is grossly normal.

* * * * *

CHEST:  . . .  The lung fields are clear to
auscultation and percussion, without wheezes, rales, or
rhonchi.  There is no increased expiratory phase of
respiration.

* * * * *

MUSCULOSKELETAL:  . . .  There is a mild loss of normal
lower cervical lordosis.  There is no tenderness in the
spinous processes or paravertebral muscle spasm.
Please see range of motion sheet for limitation in
cervical spine range of motion.

. . .  [Range of motion] of the lumbosacral spine is
normal. . . .  Straight leg raising test is normal to
90 degrees bilaterally in the seated and supine
positions.

. . .  Examination of the elbows and wrists reveals
[normal range of motion]. . . .

On dynamometer[16] testing, using the right hand,
claimant is able to generate 6 kilograms of force with
the short grip, 8 kilograms of force with the medium
grip, and 4 kilograms of force with the wide grip.
Using the left hand, claimant is able to generate 24
kilograms of force with the short grip, 16 kilograms of
force with the medium grip, and 16 kilograms of force

---

[16]Used to measure grip strength and to perform muscle
fatigue studies.

with the wide grip. Claimant was noted to give only
fair effort on dynamometer testing.

Subjective grip strength testing was moderately higher
on right than seen by dynamometer. Due to the
discrepancy in the dynamometer grip strength testing
and subjective testing, further testing was performed.
Claimant took my extended long and index fingers
bilaterally in his grip, and with the power of his grip
and his upper arm strength was able to prevent my
moving my hands in any direction, including withdrawing
them from his grasp. Individual digits were tested for
flexion and extension and found to individually have 5
out of 5 motor bilaterally.

With raising the right shoulder above 90 degrees,
claimant started to have trembling in his right upper
extremity.

Claimant is able to fully close all fingers in a fist,
pick up coins, and button clothing utilizing both
hands. Claimant is able to write with the dominant
hand. . . . There is no muscle atrophy in the hands.
Grip strength is subjectively assessed as normal at 5
out of 5 bilaterally.

* * * * *

NEUROLOGICAL: . . . There is some decreased sensation
in the right upper extremity. Otherwise, sensation in
intact to light touch, vibration, and pinprick,
throughout. . . . I am unable to elicit right triceps
or biceps reflexes. The right brachioradialis, and the
left triceps and biceps reflexes are normal. . . .
There is no evidence for muscle atrophy. . . . Motor
strength is normal at 5 out of 5 throughout.
Rhomberg[17], Hoffman's[18], Babinski's[19], and clonus[20] are

---

[17]The patient stands still with his heels together.
The patient is asked to remain still and close his eyes. If
the patient loses his balance, the test is positive.

[18]Hoffman's sign is a neurological sign in the hand
which is an indicator of problems in the spinal cord. It is

negative.  There is some tremor noted with tight grip
and with lifting the arms above the level of the
shoulder.

\* \* \* \* \*

POSTURE/MOTOR/GAIT:  Claimant is able to walk on toes,
walk on heels, and tandem walk.  Claimant can stand on
either leg alone, and can perform a squat maneuver
without difficulty.

IMPRESSION:
1.    History of cervical spine fusion at the C5 C6 and
      C6 C7 levels
2.    Irritable bowel symptoms
3.    Obesity by body mass criteria
4.    Tobacco abuse
5.    Hypertension, fair control
6.    History of depression

. . .  [H]e seemed to have an impingement leading to a
tremor of sorts when he would forward flex or laterally
abduct his right upper extremity to 90 degrees or
better.  The arm appeared to be uncontrollable above 90
degrees.  He showed that the same thing did not happen
with his left upper extremity.  He was however able to
generate significantly greater force with subjective
grip strength testing [than] that seen by dynamometer.
He had well-preserved ability to perform fine-fingered

---

associated with a loss of grip. The test for Hoffman's sign
involves tapping the nail on the third or forth finger. A
positive Hoffman's is the involuntary flexing of the end of
the thumb and index finger - normally, there should be no
reflex response.

[19]When the sole of the foot is scratched, the big toe
goes up instead of down. This is an indication that there is
a lesion (plaque) somewhere between the motor cortex, on the
opposite side of the brain, and the lower spinal cord neuron
(anterior horn neuron).

[20]Involuntary movement of rapidly alternating
contraction and relaxation of a muscle.

34

manipulations at low grip strength levels, but did seem
to have a small amount of the above-noted tremor with
firm gripping. He was actually employed for several
months after his most recent surgery, stopping with an
incarceration.

With regard to the asthma symptoms, he has not needed
hospitalization or emergency room treatment. He
continues to smoke, although much less than his prior 5
pack-per-day history.

ASSESSMENT: In regard to the workplace, claimant
should be able to work 8 hours a day in a seated,
standing or ambulatory position. He should be able to
lift 10 pounds continuously and 20 pounds occasionally.
He has full use of his left upper extremity in terms of
grasping, pushing, pulling or manipulating. He has
somewhat limited use of his right upper extremity for
lifting and cannot lift over the level of the shoulder.
He does have the ability to use his right upper
extremity for simple grasping, pushing, pulling, and
fine fingered manipulation. He has full use of his
bilateral lower extremities for operating foot
controls. He should be able to work around moving
machinery and continuously operate automotive
equipment. He should have no additional difficulties
with working in extremes of temperature or humidity or
with exposure to dust, fumes, or gas. He can bend and
squat, but not crawl, climb or work around unprotected
heights.

(Tr. at 186-191).

Dr. Budzenski found that plaintiff's right shoulder

flexion[21] was 90° and his left shoulder flexion was 120°

_____

[21]Beginning with the arm at his side, the patient will
raise his straight arm up over the head. Straight out in
front is 90°, 150° is above the head as in raising one's
hand in school.

35

(normal is 150°), his shoulder abduction[22] was 90° on the right and 120° on the left (normal is 150°), and his external rotation was 75° on the right and left (normal is 90°) (Tr. at 192).

Dr. Budzenski found that plaintiff's lateral flexion[23] of his cervical spine was 30° to the right and 25° to the left (normal is 45°). Cervical spine flexion was 30° (normal is 50°), and extension[24] was 15° (normal is 60°). Cervical spine rotation (looking side to side) was 45° both right and left (normal is 80°). Straight leg raising was negative (Tr. at 193).

On September 9, 2003, Michael Stacy, Ph.D., a psychologist, completed a Psychiatric Review Technique (Tr. at 194-207). Dr. Stacy found that there was insufficient evidence of a mental impairment.

On November 18, 2003, plaintiff saw John Carson, D.O., complaining of chronic neck pain (Tr. at 230, 238). "He has

---

[22]Abduction is raising the arm out to the side, which is 90°, and continuing up to 150° which is raised near the head.

[23]Bending the head side to side.

[24]Cervical spine flexion is bending the head forward as if looking down, and cervical spine extension is bending the head back, as if looking up to the sky.

36

reasonably good cervical range of motion and good strength
bilaterally." Plaintiff's blood pressure was stable. Dr.
Carson assessed cervical radiculopathy which "seems to be
worsening", and indicated he would "consider" using
Celebrex, a non-steroidal anti-inflammatory.

On December 1, 2003, plaintiff saw John Carson, D.O.,
complaining of vertigo (Tr. at 229, 239). "He notes that
when he is in bed, lying down, sitting up from a lying down
position, he feels like he is spinning, not sure of the
direction, but when he lies down it looks like the whole
room is spinning around, sometimes he has to move, has to
hold on to things, and it tends to make him nauseated. At
times he feels as though he is going to black out. It's
difficult for him to walk at times." During a physical
examination, Dr. Carson found that plaintiff was alert and
pleasant, sitting in a chair and appearing comfortable.
Finger to nose test was normal. He could stand with his
eyes closed and his hands outstretched. There were no
lateral or vertical nystagmus[25]. Dr. Carson's assessment

---

[25]A rapid, involuntary, oscillatory motion of the
eyeball.

was "Recurrent vertigo, possible labyrinthitis[26], no other neurological signs appreciated except for his chronic symptoms of the LE [left extremity]." Dr. Carson prescribed Meclizine (an antihistamine).

On January 6, 2004, plaintiff saw John Carson, D.O., complaining of back pain (Tr. at 231, 237, 248). "Comes in for evaluation relative to neck pain, left arm pain and back pain, he says it has just been worse over the last week or so and that it seems to be flaring up a little bit. He is doing ok in regards to his current medication, Lotensin [blood pressure medicine]. . . and Celebrex [non-steroidal anti-inflammatory]. . . but this does not completely control the pain." Plaintiff had elevated blood pressure at 142/100, and his weight was 214 pounds. "He moves his extremities well. Palpation reveals some bilateral tenderness in the lumbar spine and multiple diffuse tender points throughout his back. X-ray demonstrates some evidence of mild arthritic change of the lumbar spine." Dr. Carson assessed arthritis, chronic pain, and myalgias. He

---

[26]Labyrinthitis is an inflammation or dysfunction of the vestibular labyrinth (a system of intercommunicating cavities and canals in the inner ear). The syndrome is defined by the acute onset of vertigo, commonly associated with head or body movement. Vertigo is often accompanied by nausea, vomiting, or malaise.

prescribed Ultram and Elavil for pain and associated insomnia.

On March 23, 2004, plaintiff saw John Carson, D.O., for back pain (Tr. at 232, 236). "[H]e has a crick in his back, low back region, left side, this has been a chronic pain issue, has pain in his neck as well. The pain has been pretty severe. He applied for disability, but wasn't accepted, he is trying to do some work, he stopped taking Zoloft. He stopped taking Elavil." Plaintiff's blood pressure was 120/84 and his weight was 207.5 pounds. "Neck has pretty good range of motion. He moves his extremities well. His affect seems to be pretty good, he is not having any severe anxiety." Dr. Carson assessed back pain and "hypertension under good control". He prescribed Ultram and refilled plaintiff's Elavil. Dr. Carson told plaintiff that the medication was a "long term issue and not an immediate effect medication."

On May 4, 2004, plaintiff saw John Carson, D.O., for neck pain, back pain, and bilateral aching in his hands (Tr. at 234, 235). "He does not like to use any narcotic pain medications. He found that Ultram was helpful, he has also been taking Elavil. The chronic pain has been problematic to the point that when he uses his hands for a prolonged

39

period of time and begins to do lifting that his pain increased significantly and limits his ability to work, in relation to this he has found it very difficult to continue to work." Dr. Carson assessed cervical pain and radiculopathy. He recommended a neurosurgical consult and ordered an MRI. He started plaintiff on Neurontin and continued plaintiff on his hypertension medication.

On May 17, 2004, plaintiff had an MRI of his cervical spine performed by Mark Coburn, M.D. (Tr. at 228, 245). Dr. Coburn's impression was right-sided disk protrusion at C4-5, which may compress the exiting right C5 nerve root; status post anterior fusion at C5, C6, and C7 with normal alignment; and bilateral neural foraminal narrowing at C5-6 and to a lesser extent at C6-7.

On May 19, 2004, plaintiff was seen at the Breech Regional Medical Center Emergency Room complaining of low back pain (Tr. at 218-223). The admitting nurse observed that plaintiff had normal breath sounds. The doctor observed normal breath sounds, but made a note that plaintiff reported having emphysema and asthma, although he was a smoker. The doctor found negative straight leg raising on both legs. Plaintiff's neck was normal, non-tender, with painless range of motion. Plaintiff had full

40

range of motion in his extremities with no tenderness.  The
doctor assessed acute and chronic low back pain and gave
plaintiff Demerol.  He was then discharged to home.

On June 1, 2004, plaintiff saw John Carson, D.O., for
back pain (Tr. at 226).  "He continues to experience pain,
weakness, numbness in the right upper extremity which is
intermittent.  His cervical pain is severe and limiting him
in regards to activities, it seems that when he does any
significant lifting, or is exposed to vibration the pain
gets quite severe.  He has been taking Neurontin, also
Ultram, both of these seem to help him in regards to his
pain.  He is anxious to stay way from narcotic medications.
The problem is, is that Medicaid has refused payment for
these medications and they are quite expensive so that he
cannot afford them.  He has in the past used various
medications and non-steroidals, these have not adequately
controlled his pain."  Dr. Carson's assessment included
right side disk protrusions, C4 C5 which may compress the
exiting R C5 nerve root; status post anterior effusion, C5,
C6, C7; and bilateral neuroforaminal narrowing at C5 C6 and
also to some extent in C6 and C7.  "Continue Elavil, try to
continue the use of Ultram, Neurontin, some Neurontin
samples were provided today."

On August 25, 2004, plaintiff was seen at Truman Medical Center for a neurology consult (Tr. at 252-257). Most of the record is illegible. Plaintiff complained of chronic headaches since November 1999, and chronic vertigo since November 1999. He was smoking one and one-half packs of cigarettes per day and had for one and one-half years. Prior to that he smoked five packs per day for three years, and one and one-half packs for 20 years before that. He was a heavy drinker in the past but quit drinking two years ago. Plaintiff reported he had lost 30 pounds in the last three months due to a decrease in appetite, but on the same page plaintiff reported excessive hunger. Plaintiff had normal upper extremity muscle tone. He had abnormal left upper extremity muscle strength and abnormal pinprick sensation. None of the explanations are legible. The doctor assessed neck pain, right upper extremity pain, and thoracic pain. He told plaintiff to stop smoking, and he recommended a referral to a pain management clinic.

**V.   *FINDINGS OF THE ALJ***

Administrative Law Judge George Wilhoit entered his opinion on January 26, 2005 (Tr. at 15-22).

At step one, he found that plaintiff has not engaged in substantial gainful activity since his alleged onset date

42

(Tr. at 16).

At step two, he found that plaintiff has severe impairments of multi-level cervical spine fusion and obesity, but that his impairments of hypertension, headaches, and depression are not severe (Tr. at 16, 17).

At step three, he found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 16).

The ALJ analyzed plaintiff's credibility and found that plaintiff's subjective complaints are exaggerated (Tr. at 18-19). He found that plaintiff's mental impairment results in a mild restriction of activities of daily living; mild limitation of social functioning; mild limitation of the ability to maintain concentration, persistence, or pace; and has resulted in no episodes of decompensation (Tr. at 19). He adopted the Residual Functional Capacity as set out in Dr. Budzenski's report dated August 26, 2003, which is found at page 191 of the administrative record:

> [C]laimant should be able to work 8 hours a day in a seated, standing, or ambulatory position. He should be able to lift 10 pounds continuously and 20 pounds occasionally. He has full use of his left upper extremity in terms of grasping, pushing, pulling or manipulating. He has somewhat limited use of his right upper extremity for lifting and cannot lift over the level of the shoulder. He does have the ability to use his right upper extremity for simple grasping, pushing, pulling, and fine fingered manipulation. He has full use of his bilateral lower extremities for operating

43

> foot controls. He should be able to work around moving machinery and continuously operate automotive equipment. He should have no additional difficulties with working in extremes of temperature or humidity or with exposure to dust, fumes, or gas. He can bend and squat, but not crawl, climb or work around unprotected heights.

(Tr. at 191).

At step four of the sequential analysis, the ALJ found that plaintiff cannot return to his past relevant work (Tr. at 20).

At step five of the sequential analysis, the ALJ found that plaintiff could perform the light unskilled jobs of small products assembler and cashier II, both of which exist in significant numbers in the regional and national economy (Tr. at 21).

Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are

44

inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage,

45

effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> [T]he claimant's subjective complaints are found to be exaggerated and inconsistent with the other evidence, including the clinical and objective findings of record and are not a sound basis for decision-making. . . .
>
> The claimant testified he spends most of his time at home.  He said he sits in the recliner a lot during the day watching television.  He reported he does a few household chores but not many.  He stated he is unable to mow the yard or sweep.  He reported he drives about twice a week.  Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled.  First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.  Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the medical evidence and other factors discussed in this decision.  Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision. . . .
>
> The clinical and objective findings herein are inconsistent with allegations of total debilitation.  The record is devoid of any evidence showing a

46

significant degree of muscle atrophy, paravertebral
muscle spasm, motor loss, or gait disturbance, an
indication that claimant continues to move about on a
fairly regular basis. . . .  There is no evidence the
claimant experiences significant side effects from his
medication or that his medication has been frequently
changed or the dosage altered due to side effects.
Further, claimant's daily activities include driving
which is inconsistent with the alleged disabling
effects of medication.

The Administrative Law Judge also noted the claimant
has not been prescribed other pain modalities such as a
TENS unit, a back brace, or an assistive device for
ambulation.

. . .  [T]he claimant has a fairly consistent work
record since 1991, however, his earnings in 1997 and
1998 were significantly lower than in other years.  No
explanation for this discrepancy has been provided by
the claimant or his representative.  Consequently, the
claimant's work record draws into question his
motivation to work and his credibility as a witness
herein.  Moreover, the claimant's work record fails to
establish that he left the work force solely because of
his impairments.

(Tr. at 19).

## 1.    *PRIOR WORK RECORD*

As the ALJ noted, plaintiff has significant earnings

during most of his life.  However, in 2001 plaintiff told a

doctor that he was getting fired from his job, and in 1997

and 1998, plaintiff had almost no earnings with no

explanation.  Finally, the evidence establishes that

plaintiff left his last job due to his arrest and

incarceration, not because of his physical impairments.  In

47

fact, plaintiff did not see a treating physician for nine months after his alleged onset date.

This factor supports the ALJ's credibility determination.

## 2. DAILY ACTIVITIES

Although plaintiff testified that he spends most of his days lying down or reclining and can do no housework other than putting clothes in the hamper, the rest of the record contradicts that.  Plaintiff drives and is able to go to the grocery store; he told Dr. Budzenski in August 2003 that he was able to perform activities of daily living; and he was able to pick up coins, button clothing, and write.

The record supports the ALJ's finding on this factor that if plaintiff is lying around all day, it is more due to choice rather than a result of his impairment.

## 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

In August 2002, Dr. Ferguson noted that plaintiff was doing well after his surgery, with resolution of his neck and arm pain.  In August 2004, plaintiff told the doctor at Truman Medical Center that he had suffered from chronic headaches since 1999 and chronic vertigo since 1999; however, plaintiff worked full time, earning significant income, for several years while experiencing these headaches

48

and vertigo.  Therefore, the headaches and vertigo clearly were not disabling.  Plaintiff also complained of neck pain and arm weakness well before his alleged onset date, and he was able to earn significant income while experiencing this pain.  There is nothing in the record suggesting that plaintiff's symptoms worsened in early 2003, and in fact plaintiff rarely went to the doctor after his alleged onset date.  Therefore, the evidence suggests that the duration, frequency, and intensity of plaintiff's symptoms is not as bad as he alleges.

### 4. PRECIPITATING AND AGGRAVATING FACTORS

In November 2002, plaintiff told Dr. Mitchell that his neck pain was exacerbated by sitting, movement, coughing, or taking heavy breaths.  Later that month, he said his pain was worsened by  movement.  However, again, plaintiff was working full time during this time period, and there is no other medical evidence of precipitating or aggravating factors after plaintiff's alleged onset date.

### 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

In November 2002, plaintiff told Dr. Mitchell that Zoloft was working on his depression, and his breathing had improved with Advair.  Plaintiff also told Dr. Budzenski in August 2003 that his depression had improved with Zoloft.

49

In January 2004, plaintiff told Dr. Carson that he was doing OK on his current medication, Celebrex [anti-inflammatory]. In June 2004, plaintiff told Dr. Carson that Neurontin and Ultram helped his pain, but it was too expensive. Yet, plaintiff continued to spend significant funds on cigarettes. Dr. Carson gave plaintiff some free medication samples.

The evidence establishes that plaintiff's medication was not changed often, and his medication was effective. The evidence pertaining to this factor supports the ALJ's credibility analysis.

## 6. FUNCTIONAL RESTRICTIONS

Plaintiff testified that he could walk less than one block, he could stand for 30 minutes, and could sit for 15 minutes. However, the medical records do not support such limitations.

In January 2001, Dr. Ferguson found that plaintiff had full range of motion in his upper and lower extremities, before his neck surgery. In April 2002, Dr. Mitchell found normal range of motion and strength in plaintiff's upper extremities. In August 2003, after plaintiff's alleged onset date, plaintiff told Dr. Budzenski that he had "recovered a good portion of his decreased range of motion."

50

He appeared during the exam to be comfortable in the seated and supine positions. Plaintiff's motor scores were five out of five in all of his fingers. Grip strength was normal bilaterally. He had no muscle atrophy in his arms, indicating that he continued to use them on a regular basis.

Dr. Budzenski found that plaintiff's right arm trembled when lifted above 90 degrees and he had some decreased sensation in that arm. He had slightly decreased range of motion of his right shoulder and neck.

Despite these findings, Dr. Budzenski found that plaintiff could sit, stand, or walk for eight hours; lift ten pounds continuously and 20 pounds occasionally; could use his left arm without limitation; was unable to lift his right arm above shoulder level; had unlimited use of his legs; and should not crawl, climb, or work around unprotected heights.

In November 2003, Dr. Carson found that plaintiff had reasonably good cervical range of motion and good strength bilaterally. In January 2004, Dr. Carson noted that plaintiff "moves his extremities well." In March 2004, Dr. Carson noted that plaintiff had "pretty good range of motion" in his neck and he was able to move his extremities well. In May 2004, plaintiff was seen at the Breech

emergency room where his neck was normal, non-tender, with painless range of motion. He had full range of motion in his extremities with no tenderness. In August 2004, plaintiff was found to have normal upper extremity muscle tone, again indicating that he continued to use his arms regularly.

The medical evidence contradicts plaintiff's testimony, and the evidence on this factor clearly supports the ALJ's credibility determination.

## B. CREDIBILITY CONCLUSION

In addition to the above factors, I note the following. Plaintiff testified that he could use his arms working at a desk for a maximum of ten minutes; however, plaintiff spends significantly more time than that using his hands to smoke cigarettes during the day. In fact, plaintiff (who apparently has asthma and emphysema) has been counseled by many doctors over the years to stop smoking, but he has not.

Almost all of plaintiff's medical records predate his alleged onset date and occurred while plaintiff engaged in substantial gainful activity. After his alleged onset date, plaintiff waited nine months to see a doctor for treatment of any kind, and then saw his doctor less frequently than once a month. Plaintiff's alleged onset date corresponds

52

with his arrest and incarceration rather than any medical impairment.  Plaintiff never was noted to have any muscle atrophy in his hands or arms, indicating he was able to use them (and did indeed use them) more frequently than he claims.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints are not entirely credible.

### VII. OPINION OF DR. BUDZENSKI

Plaintiff argues that the ALJ erred in evaluating the opinion of Phillip Budzenski, M.D.  Plaintiff states that Dr. Budzenski was not a treating physician and therefore his opinion cannot constitute substantial evidence.  He also states, "The claimant testified that . . . Dr. Budzenski did not have a [dynamometer] or any other examination devices ordinarily found in a medical [doctor's] office, or an orthopedic [doctor's] office.  If this is true, then Dr. Budzenski's entire report would be suspect."

The only evidence that Dr. Budzenski did not use a dynamometer was plaintiff's testimony; and as discussed above, his testimony was found not credible.

53

Plaintiff argues that the opinions of his treating physicians, Dr. Carson and the doctor at Truman Medical Center, should be given more weight than the opinion of Dr. Budzenski. This argument is without merit for several reasons.

First, plaintiff saw the doctor at Truman Medical Center one time -- the same number of times he saw Dr. Budzenski. Therefore, merely because plaintiff chose to go to Truman Medical Center and SSA chose Dr. Budzenski gives neither doctor's opinion any weight over the other.

Second, the opinions of Dr. Carson and the Truman doctor do not differ from the findings of Dr. Budzenski. In November 2003, Dr. Carson found that plaintiff had "reasonably good cervical range of motion and good strength bilaterally." For plaintiff's cervical radiculopathy, Dr. Carson said he would "consider" using an anti-inflammatory -- hardly a medical plan for someone who is disabled. The following month, plaintiff complained of vertigo, and Dr. Carson noted no neurological evidence of vertigo and prescribed only an antihistamine. In January 2004, Dr. Carson saw plaintiff for neck pain, left arm pain, and back pain. He noted that plaintiff was doing fine on his medication, which was an anti-inflammatory. He found that

54

plaintiff was able to move his extremities well.  He
prescribed Ultram, a non-narcotic pain medicine.  Plaintiff
went the next two months without seeing any doctor, then
returned to see Dr. Carson for back pain.  During this
visit, Dr. Carson found that plaintiff's neck had pretty
good range of motion, and plaintiff moved his extremities
well.  He refilled plaintiff's Ultram.  In May 2004,
plaintiff saw Dr. Carson for back, neck, and hand pain.
This record merely recites all of plaintiff's allegations,
but also includes a note that the Ultram was helpful.  Dr.
Carson ordered an MRI and a neurosurgical consult, which
turned out to be the doctor at Truman Medical Center who
recommended that plaintiff stop smoking and go to a pain
management center.

In June 2004, plaintiff had the last of his six visits
with Dr. Carson.  Plaintiff said his medicine was helping,
but he could not afford it.  Dr. Carson gave him free
samples.

There simply is nothing in any of the records of Dr.
Carson or the Truman Medical Center physician which
contradict the findings of Dr. Budzenski.  There is no
residual functional capacity assessment in the record from
Dr. Carson.  However, Dr. Budzenski found that plaintiff had

55

decreased range of motion in his shoulder and neck, whereas
Dr. Carson continuously noted that plaintiff was moving his
extremities well and had pretty good range of motion in his
neck.  Therefore, the record establishes that Dr. Budzenski
found even more physical limitation than that reflected in
the records of Dr. Carson.

Because there is nothing in the records of any other
doctor which contradict the findings of Dr. Budzenski,
plaintiff's argument that the ALJ improperly relied on the
findings of Dr. Budzenski is without merit.

**VIII. LISTING 1.04A**

Finally, plaintiff argues that the ALJ erred in finding
that plaintiff's impairment did not meet listing 1.04A.
Listing 1.04A states as follows:

> Disorders of the spine (e.g., herniated nucleus
> pulposus, spinal arachnoiditis, spinal stenosis,
> osteoarthritis, degenerative disc disease, facet
> arthritis, vertebral fracture), resulting in compromise
> of a nerve root (including the cauda equina) or the
> spinal cord. With:
>
> A.    Evidence of nerve root compression characterized
>       by neuro-anatomic distribution of pain, limitation
>       of motion of the spine, motor loss (atrophy with
>       associated muscle weakness or muscle weakness)
>       accompanied by sensory or reflex loss and, if
>       there is involvement of the lower back, positive
>       straight-leg raising test (sitting and supine).

56

In order for a claimant to show that his impairment matches a listing, the impairment must meet all specified medical criteria. <u>Deckard v. Apfel</u>, 213 F.3d 996, 997 (8th Cir. 2000). It is plaintiff's burden to show that he meets all of the specified criteria of a listed impairment. <u>Marciniak v. Shalala</u>, 49 F.3d 1350, 1353 (8th Cir. 1995).

First, I have found no case wherein a disc protrusion qualified as a disorder of the spine, which is a necessary element of listing 1.04A, and plaintiff has failed to point to any.

Second, there is no evidence that any disorder of the spine resulted in a "compromise of a nerve root", another requirement of listing 1.04A. In this case, on May 17, 2004, plaintiff had an MRI of his cervical spine performed by Mark Coburn, M.D. who found right-sided disk protrusion at C4-5, which "may" compress the exiting right C5 nerve root. Dr. Carson reviewed that MRI on June 1, 2004, and made an identical assessment, basically copying the assessment written by Dr. Coburn.

Plaintiff argues in his motion that the neurologist at Truman Medical Center made a similar finding: "[T]he ALJ made no attempt to decipher the findings and assessments, which are critical in this case. The reason this is so

57

important is that it appears that these findings confirm that the claimant's impairments meet the 'Listings'". However, the neurologist at Truman Medical Center did not make such a finding. On page 257, the doctor merely refers to the same May 17, 2004, MRI wherein Dr. Coburn noted that a disk protrusion "may" compress the nerve root.

The listing requires "evidence of nerve root compression. As discussed above, there is no evidence of nerve root compression in this case.

Plaintiff next points out that the Truman Medical Center report "confirmed the sensory and reflex loss", information that Dr. Budzenski did not have available to him when he performed his exam. This again is without merit. Dr. Budzenski's report states, "I am unable to elicit right triceps or biceps reflexes." Therefore, it would be no surprise to Dr. Budzenski that the neurologist at Truman Medical Center found reflex loss. Dr. Budzenski's report also states, "sensation in intact to light touch, vibration, and pinprick, throughout". The fact that the Truman Medical Center doctor found decreased sensation would not likely change Dr. Budzenski's opinion since the records of doctor visits before Dr. Budzenski's examination reveal both normal sensory tests and decreased sensation (see records of Dr.

Mitchell).

Finally, there is no evidence of atrophy with associated muscle weakness or muscle weakness. Plaintiff was found to have normal strength and no evidence of atrophy in his hands or arms.

Because plaintiff has failed to establish all of the criteria required for a listed impairment, his motion on this basis will be denied.

## IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 5, 2006